From the very beginning, from 1998 when Senate Bill 781 was passed, the plain terms of Senate Bill 781, and I direct the court's attention to three pages of the joint appendix, 509, 487, and 485, taking them in reverse order. If you go to 509, that's section 7.2, paragraph 1 of Senate Bill 781, and what it says is I'd like to slow down just a little bit. Yes, your honor. It will be easier to track. JA 509, section 7.2, paragraph 1 of Senate Bill 781 states that a proportion shall be paid, the school district shall pay to the charter schools, a proportion that's based on the, quote, operating levy for school purposes, as defined in section 163.11. So operating levy for school purposes is a statutory term of art. It's defined in Senate Bill 781, several pages earlier. JA 487 sets forth that definition, and if the definition amended, it was already in the statute, but it's amended by Senate Bill 781, operating levy for school purposes was amended at JA 487 to include the operating levy plus, quote, the operating levy or sales tax equivalent pursuant to section 162.11. So right there, sales tax equivalent is what the operating levy was amended to include, and what is the sales tax equivalent referred to in 162.1100? That's two pages earlier in Senate Bill 781. That's at JA 485. Senate Bill 781 enacted 162.1100 as a whole new statute specifically directed to this particular piece of litigation. It created the transitional school district that was designed to wind down the last desegregation case that hadn't been settled in the state of Missouri, which is the city of St. Louis. Section 5 at JA 485 talks about how the transitional school district is authorized to do one of two things, to raise money for the settlement. It can either have an operating levy, which is described as a property tax increase, or it can operate a sales tax equivalent, which may be substituted for the operating levy. Because this is a kind of unique thing in Missouri law, it's the only place where a sales tax is being used to fund an educational program. And why did they do that? Basically, Senate Bill 781, the legislature says, we'll put up a lot of money to finance the settlement of the desegregation litigation, but the city has to come up with some money too. And there's two ways they can do that. First, they can do a property tax increase by a vote of the voters. But that arguably requires a supermajority, two-thirds voters to pass, and they're worried it wouldn't pass. So they said, in the alternative, you can do a sales tax increase that will then be used to go to finance the desegregation settlement. That's set forth right there in the plain text on 485 in subsection 5 of 162.1100. It refers to sales tax equivalent. It's totally unambiguous that what it's talking about is the sales tax that was passed, actually was passed about eight months later in February of 1999, and that is the actual local sales tax that the parties are disputing in this case. So that phrase, sales tax equivalent on JA 485, is the phrase that is added to the calculation of operating levy for sales tax purposes on JA 487. On sales tax equivalent, that's some odd language to use if you're just referring to a sales tax. Is the reason why it uses the word equivalent is because it's equivalent to the operating levy or the property tax? Yes, and that's right there. It says it in so many words in 162.1100, subsection 5. It says a sales tax equivalent which may be substituted for the, quote, property tax increase. So in their fourth brief, this is the first time they ever addressed this stuff. We raise it right in our first brief. They waited until the fourth brief. Their only discussion of it is in pages 8 and 9 of the fourth brief. And what they say there is, well, levy doesn't mean tax. But of course it does mean tax. If you look at JA 485, operating levy, or sorry, JA 485, it talks about operating levy or sales tax equivalent which may be substituted for such property tax increase. So operating levy is the property tax increase. That was one option. The other option was the sales tax increase, and that's what they went for. And everyone kind of expected that to happen because there was this super majority requirement. Nobody, people were worried about getting, they needed this. Keep in mind that none of the new funding from the state in Senate Bill 781 would be available at all unless the city passed a tax increase to finance its portion of it. And so there, if you go through the provisions of Senate Bill 781, it is unambiguous. And they've really presented no argument to address this anywhere in their briefs. Look at that JA 485, which is cross-referenced in JA 487, which is cross-referenced in JA 509. Those provisions, when you put them together, it's an unambiguous authorization of what everyone understood at the time, which is that we're not going to take, you know, all this money and give it just to one segment of the public school children. Charter schools hadn't been created. They were authorized for the first time also by Senate Bill 781. But once they got up and running, the parties weren't, there's another provision in Senate Bill 781, which is the Students' Bill of Rights. Provision 8 of that, which is at JA 304, talks about part of the Students' Bill of Rights is to equalize funding on a per-pupil basis as much as possible. And that's the principle that's reflected on per-pupil sharing of the local sales tax increase with the charter schools. And again, this same language kind of is the lens to which to understand Section 11 of the settlement, which talks about funding. What are the state's funding obligations? They're referred to multiple times using the same phrasing. First, they talk about full funding of Senate Bill 781. But if you carefully read Senate Bill 781, you see that it unambiguously provides that funding obligation, going all the way back to 1998, included this proportional sharing of not just the operating levy, but the sales tax increase. The sales tax equivalent, equivalent again, as Your Honor says, to the operating levy, is being shared on a per-pupil basis proportionately with the charter schools. Is the state's view then that the sales tax is really for the overall funding of the schools or the local portion of it? I know the other side calls it the desegregation tax. But it seems to me you have a different view of it. Desegregation is part of it, but perhaps the bigger part of it is just to fund the part of the schools that they're responsible for. I agree with that. And we thought desegregation tax is kind of a loaded term that was adopted to beg the question, so to speak. And you can talk about it as a desegregation tax, because again, this is all about desegregation. But keep in mind that the segment of the Missouri legislature whose votes were necessary to pass Senate Bill 781, this is in the Floetron Declaration. Senator Floetron is like, this would not have passed if I didn't have funding and authorization for charter schools in it. It was part of a global settlement. It was a deal. Funding the charter schools was part of that deal. And that segment of the legislature viewed charter schools, as we emphasized in our brief, as really a desegregation remedy in and of themselves. There was a sense that, well, if we're just going to put more money into the public school district, is that really going to give better educational options? The whole point of this is improving educational options. Are we going to create a different option? And a lot of students have voted with their feet, and they've gone to the charter schools. We're now at 36.5% of the students being educated by the charter schools. So it is about desegregation, because it was this tax's sole purpose is to fund this particular settlement. But baked into the settlement is not just the funding of the Millican II programs and so forth that are in Sections 1 to 8 of the settlement, but also a new thing in the city of St. Louis, which is charter schools. And they get funding, too. Their funding is on a proportional per-pupil basis, which makes sense. It would be very lopsided and kind of unusual if you said, well, here's the $40 million of state aid that we are going to divide up on a per-pupil basis based on the charter schools and the public schools. But this local sales tax revenue, that gets just to one segment of the public school students in the city. Charter schools are public schools. They are educating public school students. So once you look at the plain language of Senate Bill 781, every provision of the settlement agreement makes sense in light of that. When they talk about full funding of Senate Bill 781, that includes sharing the local sales tax per pupil with the charter schools. Again, if you look at all the references to per-pupil basis, per-pupil basis, that's referred to at least nine times there in Section 11. What they are contemplating is the equitable division on a per-pupil basis of all that funding on the basis of it. So essentially what they are doing is they are trying to pull out of context Section 18 and Section 22 of the settlement agreement. Keep in mind that those have to do with the transition. So the transition from the transitional school board to the regular city board that people anticipated would happen very soon. I don't think it happened that soon, but that was what was anticipated at the time Senate Bill 781 was passed. And then Section 22 is about there being a final judgment and exclusive remedies. If you look at funding, Section 11 is about funding. That Section 11 just dovetails perfectly with what's actually said there in the plain language of Senate Bill 781. If the court doesn't have any particular questions about what I've said, I reserve the balance of my time. All right, you may. Thank you, Your Honor. Mr. Root, we'll hear from you. Good morning, Your Honor. May it please the court. It's an honor to be here on behalf of intervener parents and children who have enrolled their children in charter public schools in the city of St. Louis. This is the second time in recent memory that this case has come before this court after this court authorized my clients to intervene in 2018. I want to emphasize three things in the time that I have with the court this morning. One, that the relief sought is not authorized by any provision of the settlement agreement. There is no specific provision that is authorizing this relief. Two, the passage of time forecloses the relief that is being sought, even if you could find an ambiguous provision of the settlement agreement to try and enforce. And three, the parties came to the district court on three separate occasions after 2008 seeking relief related to funding and did not raise this, which means their claims are barred by raised judicata. With respect to the settlement agreement, the first part of what I want to address with the court this morning, class plaintiffs don't indicate any specific provision that has been violated with respect to funding. The funding provisions in section 11 indicate that there should be a minimum funding amount of $60 million generated from state aid and the local sales tax together. There is no suggestion in the court below or in this court that that $60 million minimum was not met. Second, the specific funding obligations on the state of Missouri with respect to the desegregation remedies clearly ended after 10 years. There is not an additional obligation on the state to provide additional funds to the district other than what state law provides. As Mr. Sauer has argued, state law always provided for per-pupil funds to go to educate students in St. Louis, whether they were being educated at the St. Louis public school district or at the charter public schools. That was true in SB 781. When conflicts arose around that, the legislature amended the statute in 2005 in SB 287 to make more clear what was going to happen. And that amendment has generated challenges before this case. It generated a challenge to the constitutionality that was brought by the St. Louis school district. The Missouri Supreme Court rejected that in 2009. In the Committee for Educational Equality case that is cited in our briefs, it brought another challenge from Kansas City that this violated the Missouri constitution. That was rejected by the Missouri Supreme Court in 2010. And that 2010 case deserves a little bit more careful attention. It is cited at page 24 of our response brief to the class plaintiffs. It is the school district of Kansas City versus the state of Missouri. In that case, the Missouri Supreme Court made very clear how the funds flow between the state and the district and the local funds and the charter schools. The Supreme Court of Missouri said in that case, no money is actually transferred from the district to any charter school. The local revenue is not being taken away from them. What is happening is the state recognizes they are receiving per-pupil dollars from local revenue that is not being spent, of course, on the charter school students. And so adjusts the proportion of state aid appropriately to make sure that the per-pupil dollars are as equitably distributed as they can so that all the children who reside in the city of St. Louis can be educated with the same amount of state resources. The provisions that they are relying on, Section 18, simply relates to how the monies are going to be transferred between the transitional district and the school board. There is not any additional obligation there. And there is really no argument that that provision in context has been violated here. So without a specific provision that has been violated, you need to look at what the relief will do. It will profoundly disrupt the educational opportunities for children who are enrolled in charter schools. There is no dispute of fact about who they are and how many that there are. In 2017 and 2018, it is in the record that there were 11,388 students enrolled in charter public schools in the city. 7,775 of those students were African American, more than 68%. Those children would be firmly harmed by the relief that is being sought here. That makes it inconsistent with the settlement agreement. And absent some unambiguous provision in the settlement agreement that would entitle them to that relief, you should reject that request for relief and affirm Judge Autry with respect to that provision. I want to also talk about the passage of time. There is a statute of limitations that applies to this case. We believe it is a 5-year statute. There has been confusion, some, in Missouri law about whether there is a 5-year statute or a 10-year statute. There are both a 5-year statute in 516.120 and a 10-year statute in 516.110. In the past 7 or 8 years, the Missouri Supreme Court has clarified that the 10-year statute is an exception to the 5-year statute for breaches of contract. This is a breach of contract, breach of settlement agreement case. It has a 5-year statute of limitations. There is not a specific promise to pay. It is only specific promises to pay that get that longer period of time, and there is no specific promise that has been made or even allegedly breached here. If we disagree with you and hold that it is a 10-year statute of limitations, does that take care of all of the equitable arguments that have been made, like latches and others? It does not, Your Honor. Why is that? Because, as the Missouri Supreme Court has said, that latches is an equitable doctrine that prevents relief when there are special facts that would interfere with the request for relief, even when it is brought within the statute of limitations. And here there are special facts. They are in the record. The special facts are, since 2008, when the district notified the Attorney General with a copy to class council that they believed SB 287 was a violation of this settlement agreement. There were 20 charter schools that were opened in the city of St. Louis for the first time, dependent upon the funding stream authorized by Missouri law. Ms. Neal's son Marvin attends Lafayette Prep Academy. That school was opened in 2012 and subsequently expanded. All of those schools depend upon the financing that Missouri law requires on a per-pupil basis. I wanted to ask you, I realize this is not what your client did, because your client may not have been involved in the charter schools at the time, but the charter schools did take seven years, I guess, to actually try to get that funding from the St. Louis School District, and I'm wondering whether that sort of weighs in the balance of the equities. Everybody sort of sat on their rights to some extent. Yeah, so I think the case you're referring to is the 2014 case. It got reported in 2014, didn't get filed until 2008. That school opened in 2003. The way the fund stream goes, the funding is received in arrears, and so in 2004 and 2005 and 2006, they were getting funding they thought was less. It does take time to sort out that auditing and accounting of what the per-pupil accounting is and where the funds are coming from. It was in 2007-2008 that that school was making demands on the district to repay them and also making demands on the state of Missouri to repay them. It took a lot longer, and in fact in the 2014 decision, the Court of Appeals says this case has been going on too long, basically, and ordered that things be done in short order. It does take time. I respect that. Wasn't there also a period after the settlement agreement before the legislature even purported to assign these funds to the charter schools? The 1998-2005 period, is that what you're referring to? Yeah, that's when the dispute arose between St. Louis Charter School and the district about the way the money was flowing. What do you mean? It arose over seven years? Mr. Sauer says it was obvious in 1998. I believe it was. I believe that it was. And the district received the funds from the state in an unallocated, pursuant to the number of pupils that were there, and should have been distributing the funds to the schools. They were holding back the local sales tax portion from the money that they were distributing to the schools, and that generated those conflicts. They took time, as Judge Strauss notes, and as you note, Your Honor, to resolve. Finally, the parties went to district court three times in 2011. Your time has expired. Thank you, Judge. Thank you for your time. I appreciate the opportunity. All right, Mr. Douthit, we'll hear from you. Good morning. May it please the Court. William A. Douthit, on behalf of the private plaintiff classes in this litigation. Liddell and Caldwell, NAACP. Four brief quotes from the record summarize the private plaintiff classes' reason for enforcing this breach of our 1999 desegregation agreement. The parties agree that all programs and policies set forth in the agreement are the sole responsibility of the elected city board. Funding is grounded in Senate Bill 781, which provides that funding will be derived from the local sales tax approved by the voters and the amendments in Senate Bill 781 to the state's statutory scheme of school funding. The state agrees to provide the funds as set forth in Senate Bill 781, and all signatories have agreed to the financial terms. It is further ordered that the revenues from any tax imposed through a ballot measure by the transitional school district and any resulting state and federal aid excluding any attributable to transfer students shall be unconditionally assigned to city board if received by the transitional school district. What are you quoting from there? Quoting from Judge Limbaugh. Is that all in order? The quote's in order. The parties' agreement, the desegregation settlement agreement, joint appendix 186 and 187. The next quote. Go ahead. I just wanted to go ahead. The next quote from joint appendix 326 to 27, and 334 to 35, Judge Limbaugh's findings of fact and conclusions of law and the final judgment order and the memorandum approving the desegregation settlement. You know, I wanted to ask you about the unconditionally assigned language. I noticed that, and I wondered about it. I thought that was a strong argument on behalf of the plaintiffs. But I wonder if, and the word unconditional troubles me a little bit, but I wonder if the intention there was to assign the funds to the school district, and as opposing counsel mentions, then to make sure that the per pupil benefits to the charter schools and the St. Louis schools are equalized as state law provides and as the settlement agreement seems to provide as well. Judge Strauss, Proposition C, what we refer to as the desegregation sales tax, was a community gathering together to put skin in the game to fund its desegregation remedy. Judge Limbaugh, who had presided over the case prior to Judge Gunn, and reassumed responsibility with reassignment, was aware of the funding issues involved between the city district, the plaintiffs, and the state. Unconditional assignment, the voters were advised that the intent for using these monies was to fund the desegregation remediation within city schools. In 1998, with the enactment of Senate Bill 781, charter schools were independent schools. They were not defined by the state as public schools at that period of time. They were not local education agencies. The intent, clearly expressed by all parties, was that these funds from the desegregation sales tax Prop. C were to fund plaintiff's remedy. The funding of plaintiff's remedy was critical for our abandonment of our litigation where the state was compelled by this court's prior orders, affirming the district court that no less than $70 million was to be received to fund our remedies within the St. Louis public schools. Doesn't that potentially weaken your argument to some extent? Because opposing counsel mentioned this, the record mentions it too, that the charter schools were intended as part of the remedy. They were not segregated, and so they were being used to help desegregate the St. Louis schools. So wouldn't it then make sense that some of the money go to the charter schools if in fact they're aimed towards desegregation? Judge Strauss, as an officer of this court, I'm required to follow each and every of its mandates. Your 1983 mandate, the decision that authorized the 1983 settlement agreement, specifically stated sole funding purpose, that for any remediation for the intra-district violation that was in St. Louis public schools, those funds were to be delimited and received only by St. Louis public who was responsible for the implementation of removing root and branch, the prior segregation that had occurred within the dual school system. Certainly St. Louis is an anomaly. There are shared borders between charter schools and St. Louis public, but I would state to this court that shared borders alone cannot create liability for a constitutional violation. And where there is no accusation of a violation, where there is no adjudication of a violation, no federal court remedy would be appropriate in the innocent district. The imposition of court control, delegating how money should be spent. In this particular instance, the public was aware, the court was aware, FOCUS St. Louis issued a very detailed information piece. I will provide the court the citation in the joint appendix. It is there discussing the purposes for Proposition C. Prop C was the desegregation sales tax. The state of Missouri was aware of what was being said to describe it. The reviewer of the FOCUS St. Louis information being provided by the League of Women Voters, FOCUS St. Louis, a local public interest group, was the settlement coordinator in arm of the court, Dr. William Danforth. If there was any material misstatement or failure to describe, the court would have recommended this counsel who stood before public groups, who stood before the media, in support of Prop C for funding my client's remedy. We clearly stated the purpose. Just one last question. If it was so clear, I mean, I want to get a little bit to the lay. Why was there such a delay in filing the action to go after, to try to get the money from the sales tax equivalent and to deal with the state aid that was going to the charter schools? No deliberate delay, Your Honor. Again, as Mr. Root and Mr. Sauer have indicated, there's a time lag in terms of being aware of when a potential violation may occur. Yes, we were noticed not only on the 2008 letter to the state providing notice of a breach. We had had discussions with counsel for the St. Louis public schools. This settlement agreement creates a fiduciary relationship. The state collects the money for our remedy, is to distribute it unconditionally to the St. Louis public schools who are responsible for the implementation of that remedy, multiple steps. Appropriate notice under the agreement was given for the breach. The settlement agreement requires that upon notice of the party to the state of a breach, alleged to have happened by an act of the Missouri legislature, there is a cure period. The Attorney General receives notice as an opportunity of at least a year to contact the Missouri legislature and from there a clock would begin. We acted in a timely fashion. There were additional communications with the state with regard to the breach, again in 2016. But I would assert to you, Judge Strauss, in terms of your question, unconditional assignment is unconditional assignment. Judge Limbaugh was aware of the funding issues, was aware that the state, although having promised long-term funding in Senate Bill 781, stood true in terms of both the concerns of the plaintiff classes and the city board. Senate Bill 781 was repealed. However, the parties, plaintiff, defendant, Caldwell NAACP intervenors as plaintiffs, the United States, all sat at the negotiating table as equal parties. It was the party's agreement that that desegregation sales tax was unconditionally assigned to St. Louis public to pay for the remedy that was proposed. A minimum of 10 years was what was projected by the parties. I would further suggest to the court that with regard to remediation of a systemic violation, any delay, any decrease in funding has critical impact. What's your understanding of the references to per pupil in the settlement agreement? Per pupil, Judge Carlton would apply for those amounts of state aid received for students. There's the combination of students actually who are enrolled in St. Louis public schools. The state aid that flows from that enrollment in combination with the desegregation sales tax revenue unconditionally assigned to the city board that funds our remedy. The $60 million amount was the floor, Your Honor. Your view is that the state aid is allocated on a per pupil basis. The sales tax revenue goes entirely to the board. Absolutely, Your Honor. What does the agreement mean when it says the sales tax and the resulting state aid? What does the word resulting refer to? The sales tax that results from? No, no. It says the sales tax and the resulting state aid. In terms of Missouri's calculation of how the aid would apply. I believe that is the trigger. What is the trigger? What is the trigger? The combination of the funding formula as Judge Limbaugh referred to in his order. That the scheme of funding in terms of how per pupil enrollment, other supports for the. But I mean when it says resulting state aid, I'm just trying to understand what you think the state aid results from. Why does it use the word resulting? Does the state aid result from the sales tax in some way or is that referring just to the agreement? I believe the sales tax would be separate, Your Honor. That the resulting state aid would be a combination of other federal aid received. St. Louis City is a predominantly Title I district. Those Title I funds, other funds associated. So it just means resulting from? Yes, Your Honor. It would be those component pieces of the highly complex Missouri school funding formula. Yeah, and there are some provisions in here relating to the formula. Go ahead. Yes, Your Honor. Another quote that I would believe would be appropriate at this time. Judge Colleton would be the holding issued by you in the intervention case involving the Liddell plaintiffs. While Senate Bill 781 in 1998 had not required the district to pay any portion of its local tax revenue to charter schools. Senate Bill 287 in 2006 mandated that charter students receive a per people share of local tax revenue received by the district. Judge Autry quoted from this court's holding in the district court order. This court's decision in Jenkins regarding Senate Bill 287 and the diversion of funding from St. Louis public schools and the Kansas City public schools to charters. I suggest adds additional weight to the plaintiff's concern. And the negotiations at the table with the desegregation sales tax is unconditionally assigned for the purposes of our remedy. Because although the Missouri legislature had the power to repeal Senate Bill 781 and replace the funding structure with Senate Bill 287. It did not, as a party of equal stature at the negotiating table, have the power to repeal our contract, the settlement agreement, unconditionally assigning those dollars and the revenue calculated with it for our desegregation remedy. Counsel, in response to Judge Colleton's question, you talked about what Judge Autry said. But I don't understand either of the parties to be in favor of what the district court eventually ordered. Which is to say that the charter schools get the money, but they have to spend it on desegregation efforts. What's your view of the ultimate remedy that Judge Autry ordered? Am I right about that? Are you not happy with it? Your Honor, a desegregation remedy, even based on a settlement agreement, must be narrowly tailored to where the violation occurred. There has been no violation alleged in a charter school, public charter school, in its current iteration. Therefore, no funding would be proper. In addition, this court mandated intra-district remedies within St. Louis Public. The sole responsibility from the party's agreement rests with the Board of Education of the City of St. Louis, who is responsible for curing, root and branch, the dual school system. That system is St. Louis Public and St. Louis Public alone. So I take it as a no. You think that the money should go directly to St. Louis School District to take care of desegregation, not go to the charter schools at all? If those are monies for the sole purpose of desegregation and desegregation remedy, if I may, in further response to your question, Judge Strauss, and the panel's query with regard to funding, although the state and the charter schools have argued that charter schools rely on the portion of the desegregation sales tax diverted to charter schools under Senate Bill 287's funding formula, and they argue that the court's decision to enforce the desegregation settlement agreement and the final judgment order that requires all desegregation tax monies to be unconditionally assigned to St. Louis Public, during the most recent legislative session, the state addressed the concerns raised in the briefing in this case about money being taken away. The Missouri legislature has passed House Bill 1552, which revised the section discussed by both the state, Mr. Sauer, and Mr. Root. Section 1640.415 of the revised statute of Missouri on how the state funds charter schools has been amended with a new subsection, subsection 15, that requires in addition to whatever per-pupil funds the charter schools already receive from the state under the funding formula, the state will also provide to charter schools any difference between what the local schools receive from local tax revenue. In other words, the state is now obligated by law to make up the difference for any local revenue received by the local school district that charters do not receive, meaning a decision by this court to enforce our desegregation settlement agreement and the desegregation settlement order, and to require that 100% of the desegregation sales tax funds be unconditionally assigned to St. Louis Public for the benefit of my clients, will not impact the funding of the charter schools. We have never asked for any money to be taken away from any charter. Let me just, on that point, aren't you asking, you're asking for retrospective relief, though, too, aren't you? Judge Colleton? Where would that money come from? From the funds that the state of Missouri collected on behalf of my clients for the sole purpose of their desegregation remedy within the city of St. Louis. Those have already been provided to the charter schools, as I understand it, so are you suggesting that the state should basically come up with the money again, or are you asking it to be disgorged from the charter schools? How would that remedy be implemented? That would be a determination for the state, Your Honor, or if this court should show order, the suggestion would be as follows. That the victims of the prior segregation be made whole for the desegregation remedy funding they failed to receive. Since the diversion occurred in 2006, there has not been, as previously discussed before the court, a group of students from kindergarten to twelfth grade who received the full benefit of our bargain in stopping the litigation. I understand that. I'm just asking where you think the money would come from if we go back to 2006. It would be the responsibility of the state of Missouri, Your Honor. Yeah, okay. The plaintiffs should be made whole. In conclusion, as stated in our brief, Your Honor, the specific request in terms of the plaintiff's class's request upon remand to the district court, with regard to the appropriate orders I incorporate by reference as my time is down to ten seconds. I thank the court for its patience. I hope I was as fully responsive as I could be to the questions that are posed. Very well. Thank you for your argument. All right. All right. Looks like there are two minutes remaining for rebuttal for whoever is going to make it. You're going to make the rebuttal? Yes, Your Honor. Mr. Sauer? All right. Go ahead. Your Honor, I just make two points in rebuttal. First, Mr. Dowden referred to the 1983 order from the district court. If you look at JA 154 and 155, it's the first two pages of the settlement agreement, and they say multiple times that the settlement agreement supersedes any prior court orders and obligations. So it would be improper to go back to the 1983 order and say, oh, that required the charter school funding to be allocated in a certain way. And then, more importantly, turning to Section 18, which refers to funding or, sorry, this phrase about unconditionally assigned in Section 18, I want to make two points about that. First of all, what must be unconditionally assigned under 18-4? Revenues from any and all taxes imposed through the ballot measure submitted by the transitional district, that's the sales tax, and any resulting state and federal aid shall be unconditionally assigned. They can see that the state aid does get allocated on a per-pupil basis, right? So the unconditional assignment language applies both to the local sales tax revenue and the state aid that they've never contended can't be divided up in the way that we contend. They only challenge the allocation of the local sales tax revenue. So there's an inconsistency in their own position in saying unconditionally assigned means, oh, we cannot divide it. Once we got it, we can do whatever we want with it. Because certainly it doesn't mean that as a state aid. They've never contended that state aid gets divided up two different ways. And that is because their position is the state aid has always been allocated on a per-pupil basis. Well, actually, that goes back to the very same bill in 1998. That charter school allocation began in Senate Bill 781. So the very same bill that says the local sales tax have to be allocated on a per-pupil basis to the charter schools is the same bill that says that the state aid now has to be allocated on a per-pupil basis. You're switching on me. I'm talking about Paragraph 18. Right. Yes, sorry. Which is referring to per-pupil state aid. Yes, but prior to 1998, there were no charter schools. So in 1998, there's one bill that says per-pupil state aid is going to go, the local sales tax is going to go partly to the charter students, and state aid for the very first time is now going to go partly to the charter students. So in this case, they say that bill, they can see that state aid gets divided up on a per-pupil basis for the charter schools. But they say, hey, the local sales tax revenue doesn't. But obviously, unconditionally assigned can't mean two different things in the same paragraph, which is what their position entails. And if you look at the immediate, my time's expired. Very well. Thank you for your argument. The case is submitted. Thank you to all counsel. The court will file a decision in due course. Counsel are excused. Thank you for your arguments.